CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAY 18 2007

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# BIG STONE GAP DIVISION

JOANN COTTRELL,            )
       Plaintiff,            )     Civil Action No. 2:06cv00042
                        )
v.                         )     **MEMORANDUM OPINION**
                        )
MICHAEL J. ASTRUE,      )     By: GLEN M. WILLIAMS
**Commissioner of Social Security,**[1]  )     SENIOR UNITED STATES DISTRICT JUDGE
       Defendant.        )

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration.

## I. Background and Standard of Review

The plaintiff, Joann Cottrell, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Cottrell's claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2006). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings

---

[1] Michael J. Astrue became the Commissioner of Social Security on February 12, 2007, and is, therefore, substituted for Jo Anne B. Barnhart as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d)(1).

-1-

of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Cottrell protectively filed her application for DIB on or about April 29, 2004, alleging disability as of March 7, 2004, due to multiple rib fractures, a broken/torn left knee, a shoulder injury, an old back injury, high blood pressure, depression and anxiety. (Record, ("R."), at 16, 48-51, 55.) The claim was denied initially and upon reconsideration. (R. at 30-41.) Cottrell then requested a hearing before an administrative law judge, ("ALJ"). (R. at 42.) A hearing was held before the ALJ on September 13, 2005, at which Cottrell was represented by counsel. (R. at 271-99.)

By decision dated December 7, 2005, the ALJ denied Cottrell's claim. (R. at 12-23.) The ALJ found that Cottrell met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 22.) The ALJ determined that Cottrell had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ also found that Cottrell suffered from musculoskeletal impairments related to her chronic back pain and injuries sustained

-2-

in a motor vehicle accident. (R. at 22.) The ALJ found that these impairments were "severe" based upon the requirements listed in 20 C.F.R. § 404.1520(c). However, the ALJ determined that Cottrell did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) In addition, the ALJ found that Cottrell's allegations regarding her limitations were not totally credible. (R. at 22.) The ALJ also found that Cottrell possessed the residual functional capacity to perform light work[2] that allowed frequent postural changes; that did not require greater than occasional, stooping, kneeling, crouching or crawling; and that did not require overhead use of the right arm. (R. at 22-23.) Thus, the ALJ determined that Cottrell was unable to perform any of her past relevant work. (R. at 23.) Likewise, the ALJ found that Cottrell possessed no transferable skills from any past relevant work. (R. at 23.) Based upon Cottrell's age, education, past work experience and the testimony of a vocational expert, the ALJ concluded that Cottrell could perform jobs existing in significant numbers in the regional and national economy, including those of a hand packer, a sorter, an assembler, an inspector and an information clerk. (R. at 23.) Therefore, the ALJ found that Cottrell was not under a "disability" as defined under the Act, and was not entitled to benefits. (R. at. 23.) *See* 20 C.F.R. § 404.1520(g).

After the ALJ issued his decision, Cottrell pursued her administrative appeals and sought review of the ALJ's decision by the Appeals Council. (R. at 9.) The Appeals Council denied Cottrell's request for review, thereby making the ALJ's

---

[2] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can do light work, she also can do sedentary work. *See* 20 C.F.R. § 404.1567(b).

-3-

decision the final decision of the Commissioner. (R. at 5-7.) *See* 20 C.F.R. § 404.981 (2006). Thereafter, Cottrell filed this action seeking review of the ALJ's unfavorable decision. The case is currently before this court on Cottrell's motion for summary judgment, (Docket Item No. 9), filed November 30, 2006, and on the Commissioner's motion for summary judgment, (Docket Item No. 11), filed December 18, 2006.

## *II. Facts*

Cottrell was born in 1958, which classifies her as a "younger person" under 20 C.F.R. § 404.1563(c). (R. at 16, 48.) According to the record, Cottrell received her general equivalency development diploma, ("GED"), in 1979; thus, Cottrell has a "high school education" pursuant to 20 C.F.R. § 404.1564(b)(4). (R. at 274.) In addition, Cottrell has past relevant work experience as a physical therapy technician and as a sewing machine operator. (R. at 21, 56, 275-76.)

At Cottrell's hearing before the ALJ on September 13, 2005, she testified that she completed the ninth grade in high school, and then later received her GED. (R. at 274.) She explained that she had a "fair" ability to read and write. (R. at 274.) Cottrell noted that she worked as a physical therapy technician for approximately three years, where she assisted the physical therapist and worked "hands-on" with the patients. (R. at 275.) When asked about her specific duties, Cottrell explained that she was required to move patient's arms and legs, and that she also had to lift and turn patients that were in a bed. (R. at 275.) Cottrell then indicated that, prior to her employment as a physical therapy technician, she worked for approximately 14 years as a sewing machine operator. (R. at 276.) She described this particular job as a

-4-

"sitting and lifting" job. (R. at 276.) Cottrell stated that her job duties as a sewing machine operator required her to lift tubs containing her work materials. (R. at 276.) She estimated that these tubs weighed approximately 40 pounds apiece. (R. at 276.) Furthermore, Cottrell stated that this job required constant moving of the hands and arms. (R. at 277.)

Cottrell testified that she last worked on March 5, 2004. (R. at 274.) She explained that she was involved in an automobile accident on March 7, 2004, which forced her to cease work. (R. at 277.) Cottrell stated that this accident caused multiple broken ribs, a knee injury, a right shoulder injury and a back injury. (R. at 277.) She indicated that in 1980 she suffered a ruptured disk that caused her to undergo surgery. (R. at 278.) Cottrell explained that it took her about five years to recover from this surgery. (R. at 278.)

When asked to describe her current back problems, Cottrell indicated that she had a great deal of pressure and pain in her back that would radiate down into her left leg. (R. at 278-79.) She testified that her leg and foot turned blue and opined that "it cuts off the nerves or something . . . in [her] back." (R. at 279.) The ALJ noted that Cottrell had a cane with her at the hearing. (R. at 279.) When asked about the cane, she testified that, at the time of the hearing, she had been using a cane for about five months. (R. at 280.) She explained that the cane provided support and stability for her left knee. (R. at 280.) Cottrell indicated that she experienced "a burning pain on the inside of [her] left knee." (R. at 281.) Cottrell also noted that she suffered pain in her right shoulder, which made it difficult for her to hold her cane properly and made it difficult for her to comb her hair. (R. at 279-81.) Additionally, she indicated

-5-

that she experienced numbness in her right thumb and fingers. (R. at 281.) Cottrell was asked if she planned to have surgery to alleviate her problems, to which she responded "I couldn't have a surgery. I've lost my insurance." (R. at 282.)

Cottrell testified that the rib injuries suffered during the past automobile accident caused discomfort at times. (R. at 283.) She explained that the discomfort occurred when she would take a deep breath. (R. at 283.) In addition, Cottrell testified that she suffered from frequent headaches. (R. at 284.) Cottrell added that she received a prescription to treat the headaches and that she normally takes about two pills per day, with the medication taking about 45 minutes to take effect. (R. at 284.) She explained that she usually sat in her recliner while waiting for the medication to take effect. (R. at 285.)

Cottrell testified that she spent six to seven hours per day in her recliner because she was "not really able to do much." (R. at 285.) Cottrell noted that when she would become uncomfortable in the recliner, she would move to her bed. (R. at 285.) She stated that she also experienced pain when she laid down on her back. (R. at 285.) Cottrell then was asked how long she could stand without holding onto anything before she had to sit back down. (R. at 285-86.) She testified that she could stand for no more than 10 minutes. (R. at 286.) Furthermore, Cottrell stated that she had to hold on to something "about all the time." (R. at 286.) She also indicated that she experienced pain when she sat in an upright position, and noted that she could only sit in a regular chair for approximately 10-15 minutes. (R. at 286.)

Shortly thereafter, Cottrell testified that she was unable to carry and lift most

-6-

items because of back pain. (R. at 286.) She claimed that a gallon of milk was about the most she could lift. (R. at 287.) Cottrell also explained that she had been prescribed medication for her bowels and colon. (R. at 287.) She testified that those problems caused discomfort. (R. at 287.) Additionally, Cottrell stated that she had been prescribed Lexapro to treat depression and anxiety. (R. at 288.) She indicated that she first began to experience anxiety and depression after her automobile accident and, thus, she sought counseling. (R. at 288-89.) Cottrell testified that the medication she was prescribed was helpful because it was reducing her crying spells. (R. at 290.)

Cottrell was then asked to describe her daily activities. (R. at 292.) She explained that she looked through family pictures, read magazines, read the Bible and occasionally attended church. (R. at 292-93.) However, Cottrell indicated that she was unable to attend church regularly because it was difficult for her to move around. (R. at 293.) Furthermore, she explained that it was difficult for her to sit in the shower. (R. at 293.) Cottrell testified that her husband did the laundry, grocery shopping and driving. (R. at 293-94.) Nevertheless, she testified that she occasionally drove six miles to pick up her granddaughter and that she also occasionally went shopping with her husband. (R. at 294.) Cottrell stated that she had no current hobbies, but claimed that she used to enjoy hobbies such as walking, yard work and gardening. (R. at 294.)

Donna Bardsley, a vocational expert, also testified at Cottrell's hearing. (R. at 296-298.) Bardsley identified Cottrell's past relevant work as a physical therapy

technician as medium,[3] semi-skilled work, and her past work as a sewing machine operator as light, semi-skilled work. (R. at 296.) The ALJ then asked Bardsley to consider a hypothetical claimant of the same age, education and past work experience as Cottrell. (R. at 296.) In addition, the ALJ asked Bardsley to assume that the claimant was restricted to light work which allowed frequent position changes, and that the claimant occasionally could stoop, kneel, crouch or crawl. (R. at 296.) However, the hypothetical claimant had no ability to use her right extremity overhead. (R. at 296.) Based upon this hypothetical, the ALJ asked Bardsley to identify any jobs that a person with the previously described restrictions could perform. (R. at 296.) Bardsley opined that there were jobs, both regionally and nationally, that a person with those restrictions could perform, such as a hand packer, a sorter, an assembler, an inspector and an information clerk. (R. at 296-97.)

The ALJ next asked Bardsley to consider a claimant who, in addition to the previously discussed restrictions, was limited to the performance of simple, unskilled, low-stress occupations. (R. at 297.) Bardsley stated that the hypothetical claimant would be able to perform the same jobs as identified in the previous hypothetical. (R. at 297.) However, upon questioning by the ALJ, Bardsley stated that the hypothetical claimant would not be able to perform these jobs if the claimant suffered from mental impairments that caused a greater than moderate impairment to the claimant's ability to concentrate, persist or deal with work stresses. (R. at 297.) Bardsley then indicated that her testimony was consistent with the Dictionary of Occupational

---

[3] Medium work involves lifting items weighing up to 50 pounds with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do light work or sedentary work. *See* 20 C.F.R. § 404.1567(c) (2006).

-8-

Titles. (R. at 297.)

Cottrell's counsel asked Bardsley if Cottrell's use of a cane would interfere with the identified occupations. (R. at 297.) Bardsley opined that the use of a cane would interfere with work in the light category because such work involved standing and walking for six out of eight hours. (R. at 297.) Furthermore, Bardsley stated that if the particular job required standing, Cottrell would lose the use of one arm, which would impact her ability to perform the job. (R. at 297.) Bardsley also testified that Cottrell's problems with her dominant hand, headaches, dizzy spells, pain, depression and anxiety could possibly interfere with the jobs she identified. (R. at 298.)

In rendering his decision, the ALJ reviewed records from Harrogate Family Health Care, ("HFHC"); Knoxville Heart Group, ("KHG"); Dr. Tammy Baker, M.D.; Fort Sanders Regional Medical Center; Knox County Hospital, ("KCH"); Claiborne County Hospital & Nursing Home, ("Claiborne County Hospital"); Tennessee Orthopaedic Clinics, ("Tennessee Orthopaedic"); Cumberland Gap Physical Therapy; Dr. Jai Varandani, M.D.; E. Hugh Tenison, Ph.D, a state agency psychologist; Howard Leizer, Ph.D., a state agency psychologist; Dr. Frank M. Johnson, M.D., a state agency physician; Dr. Randall Hays, M.D., a state agency physician; Knoxville Radiological Group Associated, ("KRGA"); Dr. Melody Lambert, M.D.; Dr. Bilal Ahmed, M.D.; and Cherokee Health Systems. Following the hearing before the ALJ, Cottrell's counsel submitted medical records from Dr. Lambert and Dr. Ahmed.

Cottrell sought treatment from HFHC from March 25, 2003, to June 9, 2004. (R. at 106-21.) During this time period, Cottrell was treated for hypertension, fatigue,

bronchitis, gastroesophageal reflux disease, ("GERD"), weight gain, edema, right ankle/leg pain, headaches, hyperlipidemia, a possible sleeping disorder, pelvic pain, left knee pain, rib discomfort, hip pain and lower back pain. (R. at 106-21.) In order to treat these ailments, Cottrell was prescribed Vioxx, Darvocet, Atenolol and Celebrex.[4] (R. at 106-21.) It also appears that Cottrell was prescribed Percocet and Lortab. (R. at 123.)

On March 25, 2003, Cottrell presented to Claiborne County Hospital, where two chest x-rays were performed. (R. at 144.) Cottrell was diagnosed with bronchitis, while no acute infiltration or congestion was noted. (R. at 144.) Medical records also indicated that the heart was not enlarged, and no pleural effusion or pneumothorax was observed. (R. at 144.) Cottrell again sought treatment on May 19, 2003, and two x-rays of the right leg were taken. (R. at 143.) The right tibia and fibula were intact and no fracture or bony defect was identified. (R. at 143.) In addition, no opaque foreign body was noted. (R. at 143.) On the same visit, three x-rays were taken of her right ankle. (R. at 142.) No fracture, dislocation or bony defect was observed; however, there was soft tissue swelling to the right ankle. (R. at 142.) A small horizontal calcaneal spur was noted, but no dislocation or subluxation was identified. (R. at 142.)

On January 7, 2004, Cottrell presented to Claiborne County Hospital again, where three x-rays were taken of the lumbar spine. (R. at 141.) The x-rays revealed

---

[4] In addition to the above referenced prescriptions, Cottrell was prescribed several other types of medications. However, the medical records memorializing those prescriptions are largely illegible.

-10-

a normal alignment of the lumbar spine, with no fracture, dislocation or bony defect observed. (R. at 141.) At the mid and lower lumbar vertebrae, small to moderate-sized spurs were identified. (R. at 141.) Moreover, the spaces at the fourth and fifth lumbar intervertebral spaces were found to be somewhat narrow. (R. at 141.) No dislocation or subluxation was noted. (R. at 141.) On April 26, 2004, Cottrell underwent a sonogram guided thoracentesis, which identified a moderate amount of fluid collection at the posterior sulcus of the right pleural space. (R. at 140.) In a subsequent examination on April 30, 2004, two chest x-rays were taken. (R. at 139.) The x-rays demonstrated a slight increase in the accumulation of fluid at the posterior sulcus of the right lung. (R. at 139.)

Then, on June 10, 2004, Cottrell presented to Claiborne County Hospital for the purpose of having a thoracic spine x-ray. (R. at 138.) The x-ray revealed mild scoliosis of the upper thoracic spine with convexity to the right. (R. at 138.) No fracture or dislocation was observed and the intervertebral spaces were normal. (R. at 138.) Moderate-sized spurs were identified at the mid and lower thoracic spine. (R. at 138.) The medical records indicated an impression of hypertrophic spondylosis mainly involving the mid and lower thoracic spine. (R. at 138.) X-rays also were taken of the lumbar spine. (R. at 137.) The x-ray showed mild scoliosis of the lower lumbar spine with convexity to the left. (R. at 137.) Although no fracture, dislocation or bony defect was noted, the fourth lumbar intervertebral space was slightly narrowed. (R. at 137.) Furthermore, slightly increased bony sclerosis was found at the facet joint of L3-4, L4-5 and L5-S1, which was compatible with degenerative arthritis. (R. at 137.) A deformity of the coccyx was reported, which was attributed to old trauma. (R. at 137.)

Case 2:06-cv-00042-GMW-PMS   Document 13   Filed 05/18/07   Page 11 of 34   Pageid#: 70

Cottrell was referred by the HFHC to the KRGA, where a magnetic resonance imaging, ("MRI"), was taken of her lumbar spine. (R. at 145-46.) Dr. Scott A. Rosenbloom, M.D., found the conus and L1-2 level to be normal. (R. at 145.) Dr. Rosenbloom noted a bulging disc at the L2-3 level, which had caused mild thecal sac compression. (R. at 145.) Likewise, a small disc protrusion eccentric to the left at the L3-4 level had caused mild thecal sac impingement. (R. at 145.) At the L4-5 level, a bulging disc or protrusion was observed which had caused mild thecal sac impingement. (R. at 145.) Furthermore, at the L5-S1 level, a mild central bulging disc or protrusion was noted without thecal sac or nerve root compression. (R. at 145.) Dr. Rosenbloom determined that Cottrell suffered from degenerative disc disease and facet disease, which had caused foraminal narrowing at L4-5 on the right that compressed the exiting right L4 nerve root sleeve. (R. at 145.) He also noted post-operative changes on the left at the L4-5 level. (R. at 145.)

On April 29, 2003, Cottrell presented to the Knoxville Heart Group with chief complaints of chest pain, dyspnea, hypertensive cardiovascular disease, high cholesterol and severe obesity. (R. at 147.) Cottrell was instructed to proceed with beta blocker therapy. (R. at 148.) She also was advised to reduce her body mass index with calorie moderation and exercise. (R. at 147.) On May 6, 2003, testing revealed a normal sinus rhythm and sinus tachycardia segment with no overt change. (R. at 155.) Cottrell was found to have a fair exercise tolerance and good cardiac stress, on beta blocker therapy. (R. at 155.) She tested positive for dyspnea and was found to have left chest pressure that resolved in recovery phase. (R. at 155.) An exercise ECG demonstrated no overt change. (R. at 155.) An exercise rhythm sinus tachycardia found no ventricular tachycardia and no complications. (R. at 155.)

-12-

On March 8, 2004, Cottrell was injured in an automobile accident and was admitted to KCH. (R. at 169.) She presented to the emergency room with complaints of right shoulder pain, chest pain and knee pain. (R. at 169.) Cottrell did not experience loss of consciousness. (R. at 169.) X-rays were taken of the left knee, chest, lumbar spine and cervical spine. (R. at 175-76.) The left knee x-rays demonstrated no acute fractures or definite bony abnormalities and the chest x-rays showed no pulmonary contusion or pneumothorax. (R. at 175.) The lumbar spine x-ray noted no compression fractures, but did indicate degenerative disc, degenerative arthritic and sclerotic changes. (R. at 175.) The cervical spine x-ray demonstrated no acute fractures; however, it revealed a congenital anomaly with incomplete segmentation and partial effusion which involved vertebral bodies C5 and C6. (R. at 176.)

X-rays and a CT scan of the abdomen revealed multiple rib fractures and contusions. (R. at 169.) The CT scan ruled out any liver injury and found the abdominal organs to be within normal limits. (R. at 174.) Mild diverticulosis of the sigmoid colon also was noted. (R. at 174.) Repeat chest x-rays showed good aeration of the lungs with no pneumothorax; however, multiple right sided rib fractures and several superior side of the anterior rib fractures were identified. (R. at 169.) Cottrell also complained of left knee pain and swelling. (R. at 169.) Films of the left knee did not reveal a fracture. (R. at 169.) Medical records indicated that Cottrell's pain was "quite out of control [as] she was requiring [a Morphine] IV . . . for any degree of comfort." (R. at 169.) Despite this discomfort, Cottrell was "feeling somewhat improved" on the date of discharge. (R. at 169.) Cottrell was prescribed Atenolol, Celebrex and Percocet, and was directed to not work until her follow-up appointment,

-13-

which was to be three to seven days after discharge. (R. at 169.) Cottrell was discharged on March 9, 2004, and was urged to have an outpatient orthopedic assessment of her knee and shoulder. (R. at 169.)

Cottrell was admitted to Claiborne County Hospital on March 22, 2004. (R. at 177.) Cottrell complained of posterior, right-side chest pain that became worse with deep breathing. (R. at 177.) Her pain was described as "intensely pleuritic" and worsened when she would lie down. (R. at 177.) A chest x-ray showed a right pleural effusion and a right lower lobe infiltrate versus atelectasis. (R. at 177.) Although Cottrell's condition improved during her hospital stay, she was still experiencing pain with deep breathing and having a difficult time moving due to the pain in her left knee. (R. at 177.) Cottrell was instructed to continue using oxygen, incentive spirometry and breathing treatments. (R. at 178.) In addition, she was encouraged to take enough pain medication to allow her to take deep breaths without pain. (R. at 178.)

Cottrell presented to Tennessee Orthopaedic on May 19, 2004, and continued to be treated there until June 25, 2004. (R. at 183-87.) Dr. Charles Gouffon, M.D., ordered an MRI of Cottrell's left knee and found the anterior cruciate, the posterior cruciate, the medial collateral and lateral collateral ligamentous complexes to be intact. (R. at 187.) Dr. Gouffon determined that the MRI suggested a small radial tear in the anterior aspect of the posterior horn of the medial meniscus. (R. at 187.) In addition, Dr. Gouffon noted a lateral patellar tilt and mild subluxation. (R. at 187.) He indicated that the anterior horn, lateral meniscus and tibial plateau appeared to be normal and intact. (R. at 187.) The patellofemoral joint demonstrated no definite

-14-

cartilage abnormality and the quadriceps and patellar tendons appeared to be intact. (R. at 187.) There was no indication of osseous bone marrow lesions or bone marrow edema. (R. at 187.)

An MRI of the right shoulder also was performed. (R. at 186.) Dr. Gouffon found mild to moderate cuff tendinosis with no full-thickness or partial-thickness tear identified. (R. at 186.) He noted that the acromioclavicular joint was mildly hypertrophied without mass effect on the rotator cuff. (R. at 186.) A mild laterally downwardly sloping orientation of the acromion also was observed. (R. at 186.) The subscapularis tendon was intact and the long head of the biceps tendon was shown to be normally attached to the superior labrum. (R. at 186.) No labral abnormalities were noted and a normal amount of joint fluid was identified. (R. at 186.) The surrounding muscular and soft tissue structures were found to be unremarkable. (R. at 186.)

Dr. Gouffon reported that while Cottrell had not fully recovered from her injuries as of June 25, 2004, she had improved. (R. at 185.) He explained that she indicated some discomfort in the shoulder, but she acknowledged that it felt better. (R. at 185.) During the June 25 visit, Dr. Gouffon found Cottrell's range of motion to be improved, with an external rotation that approached normal. (R. at 185.) He noted that Cottrell complained of extreme pain to the knee; however, he reported very good strength in the quadriceps and around the shoulder musculature. (R. at 185.) Dr. Gouffon explained that Cottrell walked with "a very dramatic limp." (R. at 185.) He indicated that she had been walking with the assistance of an unnamed device and that she had a knee splint placed on her by a nurse practitioner at another practice.

(R. at 185.)  Dr. Gouffon opined that wearing the splint was unnecessary  because he had no evidence of any type of instability to the knee and because it would impede the ultimate recovery of the knee.  (R. at 185.)  Dr. Gouffon suggested that Cottrell cease wearing the brace and recommended continued physical therapy three times a week for four additional weeks.  (R. at 185.)

Cottrell sought physical therapy treatment at Cumberland Gap Physical Therapy from May 21, 2004, until June 24, 2004.  (R. at 188-95.)  Cottrell attended 10 treatment sessions from May 24, 2004, to June 16, 2004, and received physical therapy for her right shoulder and left knee.  (R. at 188-95.)  Improvement was noted in Cottrell's range of motion and she was reported to be motivated.  (R. at 188.)  Dr. Gouffon recommended continued physical therapy, as mentioned above; however, the record is devoid of evidence of any additional physical therapy.  (R. at 185, 188.)

On September 9, 2004, Dr. Jai Varandani, M.D., performed a consultative examination on Cottrell.  (R. at 196-201.)  Dr. Varandani noted that Cottrell entered his office with the use of a cane and limping.  (R. at 196.)  He also noted that Cottrell appeared to be in distress during ambulation, but she was not assisted.  (R. at 196.)  Cottrell informed Dr. Varandani that her back pain dated back to 1980 when she suffered an injury.  (R. at 196.)  She stated that she had a prolapsed disc and underwent a laminectomy at the L4-5 level.  (R. at 196.)  Cottrell further explained that back pain continued, but became worse after her March 2004 automobile accident.  (R. at 196.)  Cottrell reported that the pain radiated to her left leg and that her left leg would sometimes give way if she walked or stood for a significant duration.  (R. at 196.)

-16-

Cottrell also complained of left knee pain that derived from her March 2004 automobile accident. (R. at 197.) Cottrell stated that her knee pain became severe after walking approximately 50 feet. (R. at 197.) Dr. Varandani noted that Cottrell had not lost balance and had no disequilibrium. (R. at 197.) Cottrell reported right shoulder pain as well, and Dr. Varandani explained that the physical therapy had improved her range of motion. (R. at 197.) Cottrell stated that, since the automobile accident, she experienced depression, crying spells and low self-esteem. (R. at 197.) With regard to Cottrell's functional capacity, Dr. Varandani noted that Cottrell claimed to be able to walk for only about 50 feet because of back pain. (R. at 197.) He also reported that Cottrell alleged that she could only sit for approximately a half hour. (R. at 197.) Dr. Varandani opined that Cottrell appeared to be in obvious discomfort due to back pain. (R. at 197.)

Upon examination, Dr. Varandani found that Cottrell had mild to moderate tenderness at the mid-thoracic spine and mild tenderness at the lumbar spine, extending from L3, L4, L5, S1 and S2. (R. at 198.) He also reported tenderness at the right and left shoulders. (R. at 198.) Abduction on the right side was restricted to 80 degrees actively and 140 degrees passively, but was achievable through 150 degrees passively. (R. at 198-99.) There were no signs of inflammation or swelling in the left knee. (R. at 198.) Dr. Varandani found very minimal tenderness on the lateral joint line and indicated that Cottrell has a tendency to keep her left leg in a flexed position. (R. at 198.) In addition, he found Cottrell's strength, deep tendon reflexes and sensation to be intact, and a straight leg raising test was negative. (R. at 198.)

-17-

Dr. Varandani diagnosed Cottrell with chronic back pain with radiculopathy left leg secondary to the automobile accident and previous injury, chronic bursitis/tendinitis in the right shoulder and mild to moderate depression. (R. at 198.) Based upon Cottrell's statements, Dr. Varandani found that Cottrell could walk for about 50 feet. (R. at 199.) He noted that she sat for approximately 45-50 minutes during the examination and was in slight discomfort. (R. at 199.) Dr. Varandani opined that Cottrell was cooperative, with some element of depression. (R. at 199.)

On October 4, 2004, Cottrell underwent a laparoscopy with laser, bilateral salpingo-oophorectomy, lysis of adhesions and fulguration of endometriosis by Dr. Michael C. Doody, M.D. (R. at 202.) The post-operative diagnoses were post-hysterectomy pain, endometriosis and pelvic adhesions. (R. at 202-219.)

Shortly thereafter, on October 8, 2004, E. Hugh Tenison, Ph.D., a state agency psychologist, reviewed Cottrell's medical records and conducted a psychiatric review technique form, ("PRTF"). (R. at 220-33.) Tenison determined that Cottrell's mental limitations did not appear to be severe. (R. at 232.) In addition, he opinied that Cottrell's allegations as to her limitations were partially credible. (R. at 232.) He noted that Cottrell was mildly restricted in her activities of daily living, and that she experienced mild difficulties in maintaining social functioning and maintaining concentration, persistence or pace. (R. at 230.) He reported that Cottrell had experienced no episodes of decompensation. (R. at 230.) Tenison's report was reviewed and affirmed by Howard Leizer, Ph.D., on November 16, 2004. (R. at 220.)

A physical residual functional capacity assessment, ("PRFC"), was completed

by Dr. Frank M. Johnson, M.D., a state agency physician, on October 12, 2004. (R. at 234-40.) Dr. Johnson found that Cottrell was able to occasionally lift and/or carry items weighing up to 20 pounds and that she was able to frequently lift and/or carry items weighing up to 10 pounds. (R. at 235.) Additionally, Dr. Johnson found that Cottrell was able to stand and/or walk for a total of at least two hours in an eight-hour workday. (R. at 235.) However, although he checked the box indicating two hours, he added in his handwriting that Cottrell was capable of standing and/or walking for a total of three hours in an eight-hour workday. (R. at 235.) Moreover, Dr. Johnson determined that Cottrell was capable of sitting for a total of about six hours in an eight-hour workday, and that she possessed a limited ability to push and/or pull in her lower extremities. (R. at 235.) Dr. Johnson found that Cottrell was able to frequently climb and balance, and that she could occasionally stoop, kneel, crouch and crawl. (R. at 236.) No manipulative, visual, communicative or environment limitations were noted. (R. at 237.) In assessing Cottrell's credibility, he acknowledged that her daily activities limitations were consistent with previous evidence in the record; however, based upon current evidence, he opined that Cottrell's daily activities have improved. (R. at 239.) He also noted that Cottrell had aggressively pursued treatment for her impairments, which resulted in significant improvements in her symptoms. (R. at 239-40.) Dr. Johnson concluded that Cottrell's allegations as to her limitations were partially credible. (R. at 240.) Dr. Randall Hays, M.D., reviewed Dr. Johnson's report and affirmed his findings on November 16, 2004. (R. at 240.)

On October 21, 2004, Cottrell underwent an MRI of her thoracic spine. (R. at 241.) Dr. Rosenbloom found that Cottrell had mild Schmorl's node formation in the lower half of the thoracic spine. (R. at 241.) He also found disc protrusions, which

-19-

were observed eccentric to the right at T5-6 larger than T-6-7, compressing the thecal sac, but not the cord. (R. at 241.) Dr. Rosenbloom identified a small disc bulge to the left of the midline at T8-9 and diagnosed Cottrell with mild degenerative changes in the thoracic spine. (R. at 241.)

Cottrell received treatment from Cherokee Heath Systems from December 10, 2004, to June 9, 2005. (R. at 249-58.) The medical records indicated that Cottrell sought treatment from Cherokee Health Systems on December 10, 2004, on her own initiative because of depression, back pain, leg pain, knee pain, crying spells, a sleep disorder, disturbed appetite and loss of interest. (R. at 256.) Cottrell indicated that her depression had worsened since the automobile accident. (R. at 256.)

On January 6, 2005, Cottrell saw Dr. Bilal Ahmed, M.D., a psychiatrist with Cherokee Health Systems and alleged symptoms that Dr. Ahmed described as depression with heightened rejection sensitivity that had intensified since her automobile accident. (R. at 254-55.) She explained that she felt sad, irritable, jittery and that her interest in daily functioning had decreased. (R. at 254.) However, she informed Dr. Ahmed that she was still able to perform her activities of daily living without any problems. (R. at 254.) Cottrell denied any suicidal ideation and no evidence of psychosis or bipolarity was observed. (R. at 254.) He noted that Cottrell was overweight and walked with the use of a cane. (R. at 255.) Dr. Ahmed observed no gross physical discomfort. (R. at 255.) In addition, he determined that Cottrell was coherent in her thought process and that she had adequate impulse control and judgment. (R. at 255.) Dr. Ahmed diagnosed Cottrell with major depression, mild with atypical features, especially rejection sensitivity. (R. at 255.) Dr. Ahmed

-20-

assessed Cottrell's Global Assessment of Functioning,[5] score at 50 to 55. (R. at 255.) Dr. Ahmed increased her regimen of Lexapro, gave her samples of Lexpro 10mg and instructed her to take one and a half pills for one week and then two pills per day. (R. at 255.)

Cottrell again sought treatment from Dr. Ahmed on February 3, 2005, for a medication check and follow-up of her initial appointment. (R. at 253.) She noted that the higher dose of Lexapro resulted in less sadness and crying, but she explained that her irritability had stayed the same. (R. at 253.) In addition, she stated that she continued to have mild symptoms of derealization. (R. at 253.) Cottrell also explained that she had taken Tylenol PM to help with her sleeping problems and she stated that she was able to achieve about six hours of sleep per night. (R. at 253.) Dr. Ahmed reported that although Cottrell maintained a rather constricted affect in the depressive range, she nevertheless remained pleasant, polite and interactive. (R. at 253.) He also noted mild psychomotor retardation that was complicated by chronic pain and symptoms of irritability and anxiety, which were the result of certain life stresses including financial difficulties. (R. at 253.) Dr. Ahmed again suggested a higher dose of Lexapro, but instructed Cottrell to reduce the dosage to 15mg if symptoms of derealization cease. (R. at 253.)

---

[5] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994.) A GAF score of 41-50 indicates "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning." DSM-IV at 32. A GAF score of 51-60 indicates "moderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning." DSM-IV at 32.

Case 2:06-cv-00042-GMW-PMS   Document 13   Filed 05/18/07   Page 21 of 34   Pageid#: 80

Cottrell presented for another medication check and follow-up appointment on March 17, 2005. (R. at 252.) Cottrell reported that her crying spells had ceased and that she felt kind of emotionally numb. (R. at 252.) During this visit, Cottrell claimed that she had not experienced any further episodes of derealization. (R. at 252.) She was unable to recall any of her presenting symptoms, other than sadness and crying. (R. at 252.) Cottrell indicated no improvements in her subjective sadness and denied any suicidal ideation. (R. at 252.) Cottrell again reported an improvement in her crying spells and explained that there had been a decrease in irritability only after it was pointed out that irritability was one of her presenting symptoms. (R. at 252.) She discussed her ongoing financial difficulties. (R. at 252.) Dr. Ahmed noted reactivity in affect, sadness of mood, an element of indecisiveness and no evidence of psychosis. (R. at 252.) He also noted her complaints of physical pain and a change in her self-perception because of her inability to work. (R. at 252.) Dr. Ahmed advised Cottrell to continue taking Lexapro 10mg and encouraged her to continue individual therapy. (R. at 252.)

On April 15, 2005, Cottrell reported that she felt much better with regards to her mood symptoms. (R. at 251.) Dr. Ahmed observed Cottrell to be pleasant and interactive, with a more upbeat affect. (R. at 251.) He indicated that she was tolerating the Lexapro without any other dissociated symptoms or numbness. (R. at 251.) Dr. Ahmed altered his diagnosis of Cottrell and found that she suffered from major depression, mild with atypical features in partial remission. (R. at 251.) As of June 2005, Dr. Ahmed assessed Cottrell's GAF score at 55. (R. at 255.) On June 9, 2005, Cottrell reported improvement in her mood, but explained that remission of the mood symptoms had not occurred. (R. at 249.) Dr. Ahmed noted that Cottrell was

-22-

pleasant with a more upbeat affect. (R. at 249.) He also noted that her subjective sadness with mild irritability and dysphoria associated with chronic pain continued. (R. at 249.) No indication of suicidal ideation or dissociative symptoms were observed. (R. at 249.)

On July 6, 2005, Cottrell presented to Dr. Melody Lambert, M.D., and reported chronic problems such as hypertension, a spastic colon, diverticulosis, chronic back pain, headaches and hyperlipidemia. (R. at 265.) At his visit, Cottrell complained of left ear pain. (R. at 263.) Dr. Lambert indicated that Cottrell was an obese female in no acute distress. (R. at 264.) While the majority of the physical examination was within normal ranges, Dr. Lambert did report "1+ pitting edema [in the extremities] . . . bilaterally, 1+ dorsal pedal and posterior tibial pulses bilaterally." (R. at 264.) She was treated for hypertension, left ear pain, headaches and hyperlipidemia. (R. at 264.) Cottrell also was given refills on medications that she had previously been prescribed. (R. at 264.)

Cottrell presented to Dr. Lambert on September 19, 2005, for a follow-up appointment for irritable bowel, hyperlipidemia, hypertension and chronic pain. (R. at 259.) She also complained of left arm pain and chest pain. (R. at 259.) During this visit, Cottrell presented no new symptoms. (R. at 259.) Cottrell explained that she had been unable to increase her activity due to pain. (R. at 259.) Dr. Lambert reported that Cottrell was a "well-developed[,] well-nourished female in no acute distress." (R. at 259.) No edema was observed during this examination. (R. at 259.) Dr. Lambert opined that the chest pain was probably musculoskeletal because Cottrell was forced to compensate for back pain by using a cane, which she usually carried

with the left hand. (R. at 259.) Cottrell was advised to rest the left arm as much as possible. (R. at 259.) Dr. Lambert noted that Cottrell had made improvements with her hypertension and encouraged her to increase her exercise and decrease her sodium intake. (R. at 259.) Cottrell was also advised to monitor her dietary intake due to irritable bowel syndrome. (R. at 259.)

## II. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 471 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant maintains the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d), 1382c(a)(3)(A)-(B) (West 2003

-24-

& Supp. 2006); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated December 7, 2005, the ALJ denied Cottrell's claim. (R. at 12-23.) The ALJ found that Cottrell met the disability insured status requirements of the Act for disability purposes through the date of the decision. (R. at 22.) The ALJ determined that Cottrell had not engaged in substantial gainful activity since the alleged onset of disability. (R. at 22.) The ALJ also found that Cottrell suffered from musculoskeletal impairments related to her chronic back pain and injuries sustained in a motor vehicle accident. (R. at 22.) The ALJ found that these impairments were "severe" based upon the requirements listed in 20 C.F.R. § 404.1520(c). However, the ALJ determined that Cottrell did not have an impairment or combination of impairments listed at or medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 22.) In addition, the ALJ found that Cottrell's allegations regarding her limitations were not totally credible. (R. at 22.) The ALJ also found that Cottrell possessed the residual functional capacity to perform light work that allowed frequent postural changes; that did not require greater than occasional, stooping, kneeling, crouching or crawling; and that did not require overhead use of the right arm. (R. at 22-23.) Thus, the ALJ determined that Cottrell was unable to perform any of her past relevant work. (R. at 23.) Likewise, the ALJ found that Cottrell possessed no transferable skills from any past relevant work. (R. at 23.) Based upon Cottrell's age, education, past work experience and the testimony of a vocational expert, the ALJ concluded that Cottrell could perform jobs existing in significant numbers in the regional and national economy, including those of a hand packer, a sorter, an assembler, an inspector and an information clerk. (R. at 23.)

-25-

Therefore, the ALJ found that Cottrell was not under a "disability" as defined under the Act, and was not entitled to benefits. (R. at 23.) *See* 20 C.F.R. § 404.1520(g).

Cottrell argues that the decision of the ALJ was not supported by substantial evidence. (Plaintiff's Brief in Support of Motion for Summary Judgment, (Docket Item No. 10), ("Plaintiff's Brief"), at 8-14.) In particular, Cottrell first argues that substantial evidence did not support the ALJ's finding regarding the claimant's residual functional capacity. (Plaintiff's Brief at 8-14.) Second, Cottrell argues that the ALJ erred in his evaluation of the claimant's pain. (Plaintiff's Brief at 15-20.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided that his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

It is well-settled that the ALJ has a duty to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate explicitly that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*,

-26-

596 F.2d 1209, 1213 (4th Cir. 1979). While an ALJ may not reject medical evidence for no reason or for the wrong reason, see *King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if he sufficiently explains his rationale and if the record supports his findings.

Cottrell's first argument is that substantial evidence does not support the ALJ's finding as to her residual functional capacity. (Plaintiff's Brief at 8.) In the ALJ's decision, he determined that Cottrell was capable of performing light work "that allows frequent postural changes; that does not require greater than occasional stooping, kneeling, crouching or crawling; and that does not require overhead use of the right arm." (R. at 22-23.) Cottrell argues that the ALJ should have specifically offered findings as to the requirements of light work or the plaintiff's limitations, restrictions and/or work-related abilities on a function-by-function basis. (Plaintiff's Brief at 9.) Cottrell contends that the ALJ failed to offer findings as to her ability to lift items weighing 20 pounds occasionally or items weighing 10 pounds frequently; her ability to walk and/or stand; and her ability to push or pull with leg or arm controls. (R. at 10.) This argument is without merit.

Light work is work that "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Furthermore, a job is considered light work when it "requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b). In the ALJ's

-27-

opinion, he determined that Cottrell was capable of performing light work. By making this determination, the ALJ essentially found that Cottrell was capable of lifting items weighing up to 20 pounds occasionally and items weighing up to 10 pounds frequently. It was not necessary for the ALJ to specifically state how many pounds Cottrell could lift. It also should be noted that this finding is consistent with the state agency physician's findings as to Cottrell's exertional limitations. Dr. Frank M. Johnson, M.D., determined that Cottrell was capable of lifting items weighing up to 20 pounds occasionally and items weighing up to 10 pounds frequently. (R. at 235.)

The ALJ also found that Cottrell was able to perform jobs that allowed frequent postural changes, with only occasional stooping, kneeling, crouching or crawling, and that did not require overhead use of the right arm. (R. at 22-23.) Similarly, Dr. Johnson determined that Cottrell possessed the ability to only occasionally stoop, kneel, crouch and crawl. (R. at 236.) This finding was affirmed by Dr. Randall Hays, M.D. (R. at 240.) Furthermore, these findings are consistent with the definition of light work found in 42 C.F.R. § 404.1527(b). Based upon this evidence, there is substantial evidence to support this aspect of the ALJ's residual functional capacity determination.

Cottrell contends that the ALJ failed to consider her mental limitations. (Plaintiff's Brief at 12-14.) As shown in the record, Cottrell was treated for various symptoms related to depression. The ALJ found that Cottrell did not suffer from any severe mental impairments. (R. at 19.) In support of this finding, state agency physician E. Hugh Tenison opined that Cottrell's mental limitations did no appear to

-28-

be severe. (R. at 232.) Moreover, he determined that her allegations were only partially credible. (R. at 232.) The Fourth Circuit has determined that "[i]f a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986).

In this case, the medical records indicates that Cottrell was prescribed Lexapro and that her symptoms of depression responded well to the treatment. In particular, in March 2005 Cottrell informed Dr. Ahmed that Lexapro had helped eliminate her crying spells and decreased her irritability. (R. at 252.) During her visits to Dr. Ahmed, Cottrell's condition consistently improved. On April 15, 2005, Cottrell reported that she had been feeling much better with regard to her mood symptoms. (R. at 251.) Furthermore, Dr. Ahmed noted that Cottrell was pleasant and interactive with a more upbeat affect. (R. at 251.) Likewise, on June 9, 2005, Cottrell reported an improvement in her mood. (R. at 249.) Based upon the relevant medical evidence, it is apparent that Cottrell's symptoms had improved and that any mental limitations were under control with medication and treatment. Thus, there is substantial evidence to support the ALJ's finding that Cottrell did not suffer from a severe mental limitation.

Cottrell also argues that the ALJ failed to consider the effects of her obesity on her ability to work. (Plaintiff's Brief at 14.) However, the record is devoid of any medical evidence or medical opinions that indicated that Cottrell's obesity imposed any additional restrictions or limitations upon her ability to work. Therefore, the ALJ was justified in not considering Cottrell's weight.

Additionally, Cottrell argues that the ALJ erred in his evaluation of her pain. (Plaintiff's Brief at 15-20.) Cottrell contends that the record demonstrates that she suffers from medically determinable impairments that could reasonably be expected to cause disabling pain. (Plaintiff's Brief at 16.) The determination of whether a claimant is disabled by pain is a two-step process. *See Craig v. Charter*, 76 F.3d 585, 594-95 (4th Cir. 1996); 20 C.F.R. § 404.1529(b)-(c). First, there must be objective medical evidence showing the existence of an impairment that could reasonably be expected to produce the actual pain, in the amount and degree alleged by the claimant. *See Craig*, 76 F.3d at 594-95. Only after the existence of such an impairment is established must the ALJ consider the intensity and persistence of the claimant's pain and the extent to which it affects the ability to work. *Craig*, 76 F.3d at 595. Although a claimant's allegations about pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence. *Craig*, 76 F.3d at 595.

In this case, it is clear from the medical record that Cottrell has experienced significant pain, with her chief complaint being back pain. The ALJ found that Cottrell suffered from "musculoskeletal impairments related to her chronic back pain and injuries sustained in a motor vehicle accident, which are considered 'severe' based on the Regulations." (R. at 22.) The ALJ noted that Cottrell had not received treatment for any musculoskeletal complaints since June 2004. (R. at 20.) Moreover, he found that Cottrell's subjective allegations as to her ability to stand or sit for an extended period of time, in addition to minimal treatment and minimal objective findings, were inconsistent with the medical evidence. (R. at 20.) He also referenced

-30-

Cottrell's statements as to her daily activities, which included helping her husband with certain chores and occasionally driving. (R. at 20-21.) Thus, he concluded that Cottrell's allegations of pain and other symptoms were not credible to the extent alleged. (R. at 21.)

The ALJ possesses the authority to assess the credibility of a witness or a claimant. *See Hays*, 907 F.2d at 1456. Furthermore, "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984). Ordinarily, this court will not disturb the ALJ's credibility findings unless "it appears that [his] credibility determinations are based on improper or irrational criteria." *See Breeden v. Weinberger*, 493 F.2d 1002, 1010 (4th Cir. 1974). Here, the ALJ had the opportunity to review all relevant medical records, and, more importantly, he had the opportunity to observe the claimant and her testimony at the hearing. He determined that Cottrell's allegations were not completely credible. Likewise, Tenison, a state agency physician, found that her allegations as to her mental limitations were only "partially credible." (R. at 232.) Similarly, Dr. Johnson concluded that Cottrell's statements were "partially credible." (R. at 240.) Each of these state agency physicians observed some question as to the credibility of Cottrell's allegations. Accordingly, I am of the opinion that there is substantial evidence within the record to support the ALJ's finding as to Cottrell's credibility. Therefore, based upon this finding, I find that the ALJ properly analyzed and considered the claimant's allegations of pain and substantial evidence supports the ALJ's finding with regard to the claimant's pain.

Lastly, Cottrell asserts that the ALJ failed to consider her use of a cane, in so far as how it would impact her ability to work. (Plaintiff's Brief at 10-12.) At the hearing, Cottrell indicated that she used a cane for ambulation, and that she had used it for approximately five months. (R. at 278-80.) She stated that she used the cane to provide support and stability, as well as to take weight-bearing pressure off of her left knee. (R. at 280.) On June 25, 2004, Dr. Charles Gouffon, M.D., noted that Cottrell walked with a "very dramatic limp." (R. at 185.) He also indicated that "she has been walking with assistance of one in therapy." (R. at 185.) Although Dr. Gouffon does not specifically refer to a cane, his report clearly demonstrated that Cottrell had used either a cane or some other type of device to assist her with ambulation. On September 9, 2004, Cottrell presented to Dr. Varandani and he reported that she "walked in with [a] cane [and] had [a] limping gait." (R. at 196.) He also noted that she seemed to be in "obvious distress during ambulation." (R. at 196.) Cottrell informed Dr. Varandani that, following her automobile accident, her back pain was so severe that she used a wheelchair and a walker before using a cane. (R. at 196.) On January 6, 2005, Cottrell presented to Dr. Ahmed, whose medical records indicated that Cottrell "walk[ed] with the help of a cane." (R. at 254-55.)

At Cottrell's September 13, 2005, hearing, her counsel asked the vocational expert if the use of a cane would interfere with the jobs the vocational expert opined that a hypothetical person with Cottrell's limitations could perform. (R. at 297.) The vocational expert stated, "[s]ince [the jobs are] light work, it could [be]cause that involves standing and walking for six out of eight hours . . . . If she had to work standing, . . . she would lose the use of one arm. Which would affect [her] ability to complete those jobs." (R. at 297.)

-32-

In the ALJ's opinion, he found that the medical records did not document the continued use of a cane. (R. at 20.) However, based upon the previously mentioned medical records, it is readily apparent that Cottrell presented to numerous appointments with a cane. Furthermore, she testified before the ALJ that she continued to utilize the cane to support her knee. (R. at 278-80.) Moreover, the most recent medical records available demonstrated that, upon presentation, Cottrell used a cane for ambulation. As a result, I am of the opinion that substantial evidence does not support the ALJ's finding that Cottrell did not continually use the cane. Based upon the evidence before the court, there is nothing to suggest that the medical records did not document the continued used of a cane for ambulation by Cottrell. Therefore, the ALJ should have considered this limitation in determining whether Cottrell was capable of performing the jobs identified by the vocational expert. The vocational expert plainly stated that the required use of a cane would undoubtedly impact a person's ability to perform certain jobs within the light category, including the specific jobs she identified. (R. at 297.)

As previously noted, in determining whether substantial evidence support's the Commissioner's decision, the court must consider whether the ALJ properly analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *Smokeless Coal Co.*, 131 F.3d at 439-40. Here, the vocational expert opined that the use of a cane would negatively impact a person's ability to perform the identified jobs. Hence, whether or not Cottrell used a cane was critical in determining whether or not she was capable of carrying out the identified occupations. By failing to consider this information, the ALJ failed to appropriately analyze "all the relevant and material evidence." *See Smokeless Coal Co.*, 131 F.3d

at 440. In addition, the ALJ is required to sufficiently explain his findings and rationale. However, in the ALJ's opinion, he simply referenced Cottrell's use of a cane in two sentences, and essentially stated that the record did not document Cottrell's continued use of the cane. (R. at 20.) In order to fairly assess the claimant's abilities, it is only reasonable to require that the claimant's impairments and limitations be properly set forth. In this case, the ALJ unreasonably failed to consider the impact of Cottrell's use of a cane on her ability to perform the identified occupations. Thus, for the reasons stated above, I will remand this case for further consideration.

## IV. Conclusion

For the foregoing reasons, I will deny the Commissioner's motion for summary judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further consideration of Cottrell's residual functional capacity and ability to work.

An appropriate order will be entered.

**DATED:** This /9th day of May, 2007

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE

-34-